Discount Fabric House of Racine, Inc.,
Plaintiff-Respondent,

v.

Wisconsin Telephone Company, a Wisconsin
corporation, Defendant-Appellant.†

Court of Appeals

*No. 82–350. Submitted on briefs March 16, 1983.—
Decided May 25, 1983.*
(Also reported in 334 N.W.2d 922.)

† Petition to review granted.

For the defendant-appellant the cause was submitted on the brief of *F.D. Huber, Jr.* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the brief of *Russell M. Ware* and *Kent A. Tess-Mattner* of *Schoone, McManus, Hankel & Ware, S.C.* of Racine.

Before Scott, C.J., Voss, P.J., and Brown, J.

SCOTT, C.J. This is an appeal from a judgment awarding $9,000 to Discount Fabric House of Racine, Inc. for negligent omission of part of its advertisement from the 1978 Racine yellow pages. Because this court concludes that the limitation of liability provision in the Wisconsin Telephone Company's yellow pages advertising contract is not unconscionable and unenforceable, we reverse.

The facts of this case are not in dispute. Discount Fabric House of Racine, Inc. is a Wisconsin corporation engaged in the business of selling draperies and fabrics. Edward and Oryne Flatten started the business in 1968 and incorporated it in 1974. Commencing in 1976, the company did business as The Inside Look, a Division of Discount Fabric House of Racine, Inc. The business had been listed and advertised in the Racine and Kenosha yellow pages for many years.

Mr. Flatten, acting as corporate vice president, entered into a contract with Wisconsin Telephone for advertising in the 1978 Racine and Kenosha telephone directories. The contract provided for a quarter-page ad and three listings in the Racine yellow pages and an advertisement in the Kenosha yellow pages, in addition to the white pages listings. The contract contained the following statement, placed immediately below the buyer's signature:

UNDERSIGNED AGREES THAT THE TERMS ON THE REVERSE SIDE HEREON CONSTITUTE PART OF THIS APPLICATION. READ REVERSE SIDE BEFORE SIGNING.

The reverse side of the contract contained, *inter alia,* the the following provision:

4. Applicant agrees that the Telephone Company shall not be liable for errors or omissions (including total omissions) in directory advertising beyond the applicable charges for the item or items in which errors or omissions occur for the issue life of the directory involved.

When the 1978 telephone directories were published, Flatten discovered that the words "Discount Fabric House" were omitted from the quarter-page ad. All of the other information in the ad was correct, including the name, The Inside Look, the firm's address and telephone number. Further, all of the other listings in both the Racine and Kenosha directories were without error.

Upon notification, Wisconsin Telephone admitted the error and adjusted the charges in accordance with paragraph four of the contract. Discount Fabric House subsequently initiated this lawsuit, alleging a breach of the contract and seeking $300,000 in damages due to lost profits. Wisconsin Telephone raised as a defense the limitation of liability clause contained in paragraph four.

The case was tried to a jury on the damages issue with the legal question reserved to the trial court. The jury awarded $9,000 to Discount Fabric House and $388 to Wisconsin Telephone for unpaid charges relating to the correct listings. The trial court subsequently ruled that the limitation clause was unconscionable and invalid on general consumer protection and public policy grounds.

Wisconsin Telephone appealed, and this panel certified the case to the Wisconsin Supreme Court as a matter of statewide importance. The appeal now comes before this court upon denial of certification by the supreme court.

Wisconsin Telephone argues that the trial court erred in holding that the limitation clause was unconscionable. We agree.

The doctrine of unconscionability is somewhat amorphous. An unconscionable contract has been defined as one which no man in his senses, not under delusion, would make, on the one hand, and as one which no fair and honest man would accept, on the other. *Hume v. United States*, 132 U.S. 406, 411 (1889). The general principle governing the validity of contracts against the charge that they are unreasonable is stated in 14 *Williston on Contracts* § 1632 (W. Jaeger 3rd ed. 1972) :

People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

The unconscionability doctrine was codified in the Uniform Commercial Code § 2–302 of the Article on Sales.[1] Although this section deals primarily with contracts for the sale of goods, the drafter's official comments may

---

[1] The U.C.C. § 2–302 (1962) as adopted by Wisconsin is found in sec. 402.302, Stats. It provides, in part:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

provide some insight into the appropriate use of the unconscionability doctrine to invalidate a contract:

1. . . . The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . The principle is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power.

Sec. 402.302, Stats., Official U.C.C. Comment. Thus, mere inequality of bargaining power would not be sufficient to invalidate an agreement.

The courts have identified a number of other factors to be considered in determining the applicability of the unconscionability doctrine to a given set of facts. These factors include: (1) the use of printed form or "boilerplate" contracts drawn by the party in the strongest economic position and offered to the weaker party on a take-it or leave-it basis, *Campbell Soup Co. v. Wentz,* 172 F.2d 80 (3rd Cir. 1948); (2) exploitation of the underprivileged, unsophisticated, and uneducated buyer of consumer goods, *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445 (D.C. Cir. 1965), and (3) the hiding of clauses disadvantageous to one party in a mass of fine print, *Henningsen v. Bloomfield Motors, Inc.,* 161 A.2d 69 (N.J. 1960).

Additionally, the courts consider such factors as: (1) significant cost-price disparity; (2) the inclusion of penalty clauses; (3) the circumstances surrounding the execution of the contract; (4) the phrasing of clauses in "legalese" incomprehensible to a layman, and (5) an overall imbalance in the obligations and rights imposed by the bargain. *See Wille v. Southwestern Bell Telephone Co.,* 549 P.2d 903, 906–07 (Kan. 1976). The *Wille* court concluded:

In summary, the doctrine of unconscionability is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain.

*Id.* at 907.

Discount Fabric House and the trial court focused on the fact that the contract in question was a standardized form contract and that it was not subject to any bargaining or negotiating regarding its substantive terms.[2] They found legal support for their position in *Allen v. Michigan Bell Telephone Co.,* 171 N.W.2d 689 (Mich. Ct. App. 1969). In *Allen,* the Michigan Court of Appeals found a clause similar to the one at issue in the instant case to be unconscionable. The court conceded that it is not generally against public policy for a telephone company to limit its liability for its own negligence in all circumstances. Nevertheless, the court found that the limitation of liability clause was unconscionable because of the unequal bargaining power, the monopolistic nature of yellow pages advertising, and the advertisers' inability to bargain for any terms. *Allen,* 171 N.W.2d at 693.

---

[2] The trial court's memorandum decision stated, in part:

The Court believes that the yellow pages are a necessary form of advertising for small businesses; that there is no equal competitive method to the yellow pages for telephone advertisement; that the customer was unable to bargain for the terms and conditions; and, that the customer was compelled to accept the printed form.

The Court is satisfied that the plaintiff did not have a meaningful choice, that the defendant had the bargaining power in a gross unbalanced manner in determining the terms and conditions in the directory advertisement which was an indispensable element of telephone service. The customer did not have a free choice nor did he have bargaining power. A clause limiting liability is contrary to the present day belief of customer protection and this Court believes that this clause limiting liability is unconscionable and against public policy.

The position adopted by the *Allen* court is distinctly in the minority.[3] The overwhelming majority of jurisdictions have found this type of exculpatory clause to be valid.[4] The majority viewpoint holds that the inequality of bargaining power between the telephone company and the businessman desiring to advertise in the yellow pages is more apparent than real. *Gas House, Inc. v. Southern Bell Telephone and Telegraph Co.*, 221 S.E.2d 499, 505 (N.C. 1976). Although there may not be one alternative means of advertising which provides exactly the same service at comparable costs, alternative advertising media are available. *Louisville Bear Safety Service, Inc. v. South Central Bell Telephone Co.*, 571 S.W.2d 438, 440 (Ky. Ct. App. 1978). These alternatives may be used where the businessman finds the telephone company's terms unacceptable. The situation is not different from that which exists in any other case in which a potential seller is the only supplier of the particular service desired. *Gas House, Inc.*, 221 S.E.2d at 505.

Further, the limitation of liability may contribute to the relatively low cost of the ads. This greatly increases

---

[3] It is not clear how the Michigan courts would address this issue today. In a later appeal of the *Allen* case, *Allen v. Michigan Bell Telephone Co.*, 232 N.W.2d 302, 304 (Mich. Ct. App. 1975), the court stated:

While the author of this opinion might have decided the issue in the prior appeal differently, that decision must be treated as the law of the case. . . . We note that the Supreme Court in denying leave to appeal of the former decision stated: "Denial of leave is not to be taken as tacit or other agreement with all the reasoning of the majority opinion below."

[4] In its memorandum decision, the trial court noted that the following states have upheld the validity of limitation of liability provisions similar to the one at issue in this case: Arizona, Arkansas, California, Colorado, Delaware, Florida, Kansas, Louisiana, Maryland, Missouri, Montana, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Vermont and Washington.

the ability of small businesses to reach a larger market. This advantage would be lost if the telephone company found it necessary to raise its advertising rates to protect itself against all losses possibly resulting from errors in the directory. As the North Carolina Supreme Court stated in *Gas House, Inc.*:

It would be virtually, if not completely, impossible to determine what portion of the business done by an advertiser is attributable to its use of "Yellow Page" advertising. There are many factors which enter into periodic fluctuations in the volume of business done by a seller of goods. The purpose of the Limitation of Liability Clause is to protect the telephone company from the danger of verdicts primarily speculative in amount. This is not an unreasonable objective. In this respect, the telephone company is not in a different position from the local newspaper, radio or television station, or other advertising media.

*Id.*

We find that the majority position on the limitation of liability clause represents the better-reasoned approach. Mere inequality of bargaining power coupled with a form contract, in the absence of undue surprise or oppression, will not lead to a finding of unconscionability. Discount Fabric House has not alleged that it was unaware of the exculpatory clause, or its implications, when it entered into the telephone company contract. Consequently, we find that the limitation of liability clause contained in paragraph four of the advertising contract is not unconscionable, and the trial court erred in awarding $9,000 to the plaintiff.

*By the Court.*—Judgment reversed.


BROWN, J. (concurring). The issue, as I see it, is this: Should enforcement of a liquidated damages clause

be denied where it is manifestly inadequate to compensate the victim of the breach? [1]

The telephone company, it seems to me, has a risk aversion to lawsuits resulting from erroneous yellow pages advertisements. The company fears that expected damages are uncertain or too difficult to determine. If the ascertainment of damages were left to the judicial arena, the risk would be magnified. This juridical risk carries with it the danger that a court or jury may be swayed by "irrational factors" to decide against a powerful client. [2]

Because it is too difficult to determine whether a particular injury is attributable to a yellow pages ad, the telephone company negotiates a liquidation clause with its customers. Certainly, the costs of negotiating are less than the expected costs resulting from reliance on the standard damage rule for breach. [3] After all, it is much better to return the cost of the ad than to face exposure to a high jury award.

Negotiation of this liquidation clause is not necessarily unconscionable because the customer gets something out of it as well. Because potential costs are down, output expands and consumers are better off. The transaction costs in ordering an ad in the yellow pages are reduced. Thus, both the telephone company and the customer receive a benefit from the liquidated damages agreement. If the agreement were to be declared unconscionable, costs would rise and the "protected" customers would find it more expensive to contract on their own behalf.

I would agree that, in the absence of unfairness or other bargaining abnormalities, efficiency would be maximized by the enforcement of the agreed risks embodied in

---

[1] R. Posner, *Economic Analysis of Law* § 4.10 (2d ed. 1977).

[2] Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum. L. Rev. 629, 631 (1943).

[3] Goetz & Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model*

a liquidation clause.[4] Here there is a failure of proof that the agreement is either unfair or abnormal.

True, the telephone company has a virtual monopoly on yellow pages advertisements. Its own studies, made part of the record here, show that it has more advertising advantage and reaches more people and in a more direct manner than television, radio or newspaper and at a fraction of the cost. It is an important tool for commercial business, whether small or large. We cannot say, therefore, that if a customer does not like the liquidation clause, he or she can go to a competitor, or a different advertising medium, because there is no worthy competitor or other medium. The consumer, therefore, is in an inferior bargaining position. The contract must be signed with the liquidation clause included or the contract will not be signed at all.

Just because the telephone company has a superior bargaining position, however, this does not mean that the liquidation clause should be held unconscionable. There must first be evidence that the telephone company has taken advantage of its one-sided privilege so that it insensitively breaches its promise to provide a correct ad, caring only that there will be little or no attendant risk of having to pay for its mistake.

In fact, there has been no proof in this case that the telephone company is guilty of deliberate or even non-deliberate insensitivity due to its monopolistic insulated position. Rather, there is proof that the telephone company is ninety-nine percent accurate with respect to its yellow pages advertisements, which hardly shows abnormality, unfairness or insensitivity. It would seem that the

*and a Theory of Efficient Breach,* 77 Colum. L. Rev. 554, 559 (1977).

[4] Goetz & Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach,* 77 Colum. L. Rev. 554, 578 (1977).

consumer should be willing to take the risk that his or her ad might be inaccurate, a risk of one percent, in return for low prices.

I differ from the majority, however, in that I would limit the decision to the facts in this case. I would leave the door open for plaintiffs who can make a factual showing that the telephone company refused to provide safeguarding service which was economically viable. In a different case, there may clearly be a showing of insensitivity by the telephone company due to its monopolistic position. For instance, if it can be shown that telephone companies in other states provide better proofreading at a viable cost but this is ignored by the Wisconsin Telephone Company, insensitivity might be shown; if a company refuses to be cost effective simply by nature of its position, its liquidation clause should be subject to judicial scrutiny. The telephone company should not be able to do anything it wants. It may not enact private legislation by contract. If that were the case, allowance of a liquidation clause might come at too great a price. In most cases, the mutual interests of parties tend to lead them to bargain their way to the most efficient allocation of risks. The proof does not suggest otherwise in this case. Where the monopoly is shown to abuse its power to the detriment of cost effectiveness of the whole market, this case should not stand as precedent for allowing abuse to continue.